

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

NATHAN P. DOHERTY, on behalf of
himself and all others similarly situated,

                     Plaintiffs,

    v.

JOHN C. PHELAN,
SECRETARY OF THE NAVY,
UNITED STATES OF AMERICA,
in his official capacity,

                     Defendant.

---

Civil Action No. **26 CV 101**

**CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

## I. INTRODUCTION

1.    This action challenges the Navy's systemic failure to comply with two nondiscretionary legal duties designed to protect injured reservists: (1) the duty to issue interim Line of Duty (LOD) determinations under JAGMAN § 0224, and (2) the duty under 10 U.S.C. § 12301(h) to order to, or retain on, active duty reservists who require medical evaluation or treatment for injuries incurred during a prior period of duty.

2.    The Navy failed to comply with mandatory legal duties intended to protect reservists who are injured.

3.    The Navy did not perform required duties for Plaintiff, resulting in a loss of medical and disability benefits.

4.    The Navy did not process required determinations and did not allow access to accredited Veterans Service Organizations (VSOs) at demobilization.

5.    The Navy has failed to comply with the fiscal obligations imposed by Title 10.

6.     The Navy did not provide access to accredited counsel, which resulted in reservists not receiving advice about their rights.

7.     Plaintiff does not seek money damages. Nor does he seek judicial second-guessing of medical judgment or military operations.

8.     Plaintiff seeks only declaratory and injunctive relief compelling the Navy to comply with binding statutes and regulations Congress and DoD established for the protection of reservists.

9.     Congress enacted § 12301(h) to ensure injured reservists receive proper evaluation or treatment before release from active duty.

10.    JAGMAN § 0224 serves as the procedural trigger that preserves duty status, medical access, and evidentiary documentation.

11.    DoDI 1241.01 prohibits releasing a reservist from active duty while the military is still determining whether an injury is duty-related.

12.    Plaintiff's case exemplifies the Navy's systemic noncompliance. He suffered a severe ACL and meniscus injury on active duty.

13.    Navy and Army medical officers documented the unfitting condition repeatedly, and Army orthopedic surgeons scheduled reconstructive surgery.

14.    Despite this, the Navy issued no interim LOD, initiated no formal LOD, and denied § 12301(h) retention using an extra-statutory "temporal locality" rule that contradicts the statute's text and purpose.

15.    As a result of these unlawful omissions, Plaintiff was released from active duty three days before his scheduled ACL reconstruction, immediately losing his Tricare eligibility,

continuity of care, and access to military treatment facilities. (See Release Orders/DD-214, attached hereto as **Exhibit B**)

16.    The Navy's failure to issue an LOD also deprives Plaintiff of documentation essential for the Disability Evaluation System and Department of Veterans Affairs.

17.    The Navy's own records confirm the violation. In a December 13, 2024 email, the Director of PERS-95 acknowledged that Plaintiff's injury fits the parameters for "LOD-HC" (Line of Duty - Health Care), that he needed the surgery, and that the Navy's prior MEDHOLD denial prevented him from receiving it (**Exhibit D**).

18.    PERS-95 sought a workaround only after the harm had already occurred—an admission that the required LOD and retention processes were not followed when legally required.

19.    Independent oversight bodies have found Navy administrative processes to be noncompliant with statutory mandates.

20.    The Navy did not process Plaintiff's claims or provide determinations required by statute and regulation.

21.    Plaintiff seeks an order requiring compliance with applicable statutes and regulations for himself and others similarly situated.

## II. JURISDICTION AND VENUE

22.    This Court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 702–706, and the governing Department of Defense and Department of the Navy regulations.

23.    Sovereign immunity is waived for this action under 5 U.S.C. § 702 because Plaintiff seeks declaratory and injunctive relief requiring the Navy to follow statutory and regulatory requirements concerning reservists.

24.    Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiff resides within the District, his Navy Reserve Center is located here, and a substantial portion of the events or omissions giving rise to the claims occurred here, including failure to issue the required interim LOD.

25.    The Navy issued a denial of § 12301(h) retention, which determined Plaintiff's active-duty status and his right to medical care.

26.    No statute or regulation requires exhaustion of internal Navy appeals before seeking judicial review; the available internal remedies do not provide an automatic stay of the Navy's decision.

### III. PARTIES

27.    Plaintiff is a sailor. Specifically, Plaintiff is a submarine-qualified First Class Yeoman in the Navy Reserve with approximately 14 years of qualifying service, including approximately 10 years on active duty. He is a resident of Buffalo, New York. As a member of the Reserve Component, he is subject to the regulations and statutes governed by the Department of the Navy and the Department of Defense.

28.    Defendant John C. Phelan is the Secretary of the Navy, sued in his official capacity. The Secretary is responsible for the conduct of all affairs of the Department of the Navy, including the implementation of statutes and regulations governing duty status, Line of Duty determinations, and the medical retention of reservists.

### IV. STATUTORY AND REGULATORY FRAMEWORK

4

## A. JAGMAN § 0224 – Mandatory Interim LOD Determinations

29.    JAGMAN § 0224, titled "Special Considerations in Reserve Component Cases," requires the Navy to issue interim LOD determinations and does not allow commands to treat this requirement as optional.

30.    The regulation contains no exceptions. Interim LODs serve as the procedural safeguard that preserves duty-status rights, protects access to medical evaluation and treatment, and prevents evidentiary gaps in later disability, VA, and DES adjudications.

31.    The Navy may not disregard JAGMAN § 0224 or treat interim LOD initiation as optional or not necessary.

## B. SECNAVINST 1770.5 – Formal LOD Investigations

32.    SECNAVINST 1770.5 implements 10 U.S.C. § 1074a and requires initiation of a formal LOD investigation whenever a potentially duty-related condition could impact entitlement to medical care or disability processing.

33.    Failure to initiate an LOD determination under SECNAVINST 1770.5 can preclude service members from accessing statutory benefits.

## C. 10 U.S.C. § 12301(h) – Ordering to or Retaining on Active Duty for Medical Evaluation or Treatment

34.    Section 12301(h) authorizes the Secretary concerned to order reservists to active duty or retain them on active duty for the purpose of: (1) medical evaluation of a condition incurred or aggravated during a prior period of active service, or (2) medical treatment of such a condition.

35.    Statutory amendments, including Section 1075 of the FY 1997 NDAA, expanded the application of duty-related medical coverage for reservists.

**D. DoDI 1241.01 – Duty to Maintain Active Duty Status Pending LOD Determination**

36.    DoDI 1241.01 requires that reservists not be released from active duty until their injury has been evaluated for line-of-duty causation.

37.    The Instruction prohibits releasing an injured reservist from active duty prior to determining whether the condition was incurred or aggravated in the line of duty.

38.    Under DoDI 1241.01, no reservist may be released while a potentially duty-related injury remains unevaluated. Plaintiff's release prior to LOD adjudication—and prior to his scheduled surgery—violated this mandate.

**E. PERS-95 SOP 6000 Administrative Procedures**

39.    The Navy utilizes PERS-95 SOP 6000 (Aug. 2022) to manage Line of Duty benefits. Section 4.b(1) of the SOP directs commanders: 'IF SAILOR IS NOT ALREADY IN THE MRR PROCESS, DO NOT SUBMIT A MRR PACKAGE FOR LOD-B FOR DES.' This policy requires injured reservists to be processed through the non-duty related Medical Retention Review (MRR) pathway before they are permitted to request a duty-related determination. The SOP enforces a 60-day window for appeals that restricts the processing of duty-related determinations for injured reservists.

## V. FACTUAL BACKGROUND

**A. Plaintiff Suffered a Severe, Deployment-Limiting Injury While on Active Duty**

40.    In March 2024, while serving on active-duty orders in Naples, Italy, Plaintiff sustained a traumatic injury to his left knee during authorized physical training.

41.    Navy medical providers documented acute swelling, instability, and suspected ligament damage. Standardized medical notes recorded persistent effusion and mechanical symptoms.

42.     MRI imaging later confirmed a complete ACL rupture and complex medial meniscus tear, with associated joint pathology (relevant medical records are attached hereto as **Exhibit A**). These findings were documented by Navy and Army medical departments across multiple duty periods.

43.     The condition substantially impaired Plaintiff's ability to perform military duties and was formally identified as deployment-limiting by Navy medical officials (**Exhibit A**).

44.     Under JAGMAN § 0224, the presentation of a potentially unfitting condition required the immediate issuance of an interim LOD within seven days. No interim LOD was initiated at any time.

**B. The Navy Cancelled Plaintiff's Mobilization Due to the Injury**

45.     In August 2024, Plaintiff reported to the Navy Mobilization and Deployment Support Command (MDSC) in Norfolk, Virginia for pre-deployment processing.

46.     MDSC physicians again documented left knee instability, confirming the prior diagnosis and explicitly finding Plaintiff Not Physically Qualified (NPQ) to deploy. (See Demobilization Orders with NPQ Determination, attached hereto as **Exhibit C**)

47.     On August 8, 2024 the Navy cancelled Plaintiff's mobilization because medical providers found him unfit for deployment due to injury.

48.     Despite these mandatory triggers, the Navy initiated none of the required processes.

**C. MDSC Placed Plaintiff into Medical Evaluation Status but Failed to Initiate Required LOD Procedures**

7

49.    Following cancellation of his deployment, MDSC placed Plaintiff in a "Medical Evaluation" status, a classification reserved for potentially unfitting injuries requiring evaluation or treatment. (See **Exhibit R**, MDSC SHPE/Primary Care Note, Aug. 21, 2024).

50.    Placement in Medical Evaluation status serves as a definitive administrative confirmation that the member has an unresolved medical condition. The MDSC SHPE explicitly records that **'SM [Service Member] will be placed in MED EVAL program for Left knee pain and mental health concerns,'** satisfying the requirement in JAGMAN § 0224 for a command to identify a case requiring investigation.

51.    Nevertheless, MDSC issued no interim LOD and initiated no formal LOD.

52.    At demobilization, Plaintiff was instructed by MDSC staff to limit reporting of his injury history to only the current period of orders (**Exhibit G**).

**D. Contractor-Led Transition Counseling and Access to Representation**

53.    While at MDSC, Plaintiff observed that the Navy delegates its mandatory transition counseling duties to third-party contractors bound by restrictive "script-only" performance work statements. When Plaintiff—an accredited VSO—attempted to interject during a mandatory briefing to provide critical context regarding LOD determinations, he was silenced by contractors citing their contractual prohibition against non-scripted information.

54.    Furthermore, on March 27, 2025, Plaintiff attempted to assist a sailor by submitting a signed DD Form 2870 (Authorization for Disclosure of Medical or Dental Information) and VA Form 21-22 (Appointment of Veterans Service Organization) to the MDSC Medical Department. Despite the validity of these federal forms, the Senior Medical Department Representative (HMC) refused to process the request, stating in an email: "member will need to reach out to us... directly." (**Exhibit V**).

8

55.     On or about August 6, 2024, while processing through the Mobilization and

Deployment Support Command (MDSC) in Norfolk, Virginia, Plaintiff reported to Medical Case

Management.

56.     Plaintiff explicitly requested that the Navy initiate a Line of Duty (LOD) inquiry

for his service-connected back condition, which had been aggravated by his active service

(**Exhibit E**).

57.     Navy medical personnel at MDSC informed Plaintiff that they could process only

one injury at a time (**Exhibit F**).

58.     Despite the requirements of SECNAVINST 1770.5 and 10 U.S.C. § 12301(h) to

evaluate all service-connected conditions, the Navy's unwritten policy prohibited the processing

of Plaintiff's secondary injuries.

59.     As a direct result of this refusal, Plaintiff was subsequently released from active

duty on December 8, 2024, without an LOD determination or medical hold orders for his back

condition.

60.     The absence of an interim LOD was cited as the reason for denying § 12301(h)

rights.

**E. Army Orthopedic Surgeons Scheduled ACL Reconstruction**

61.     Plaintiff was evaluated at McDonald Army Health Center at Fort Eustis, where

orthopedic surgeons confirmed a complete ACL tear with associated meniscal injury.

62.     Army surgeons scheduled Plaintiff for ACL reconstruction surgery on December

11, 2024, noting the medical necessity of the procedure and the requirement for continued active-

duty status during preoperative and postoperative care.

63.     These findings were forwarded by MDSC to PERS-95 as part of a MEDHOLD / §
12301(h) request for retention on active duty.

64.     Under § 12301(h), these facts compelled retention: the injury was incurred on a
prior period of active duty; causation was still undergoing evaluation; and medical treatment was
necessary and already scheduled. Plaintiff satisfied every statutory condition for retention under
§ 12301(h).

**F. PERS-95 Denial of § 12301(h) Retention Based on Navy Policy**

65.     On or about November 12, 2024, PERS-95 issued a written denial of § 12301(h)
retention.

66.     The sole stated reason was that Plaintiff's injury did not occur on this period of
active duty (**Exhibit W**).

67.     This rationale does not appear anywhere in § 12301(h), which explicitly
authorizes ordering to or retaining on active duty for injuries incurred during any prior period of
service.

68.     The denial disregarded the medical record, the pending surgical date, and the
Navy's obligation under DoDI 1241.01 not to release an injured reservist before completing
duty-status causation.

**G. Loss of Accrued Leave**

69.     The prejudice of the unlawful release was compounded by the erasure of
Plaintiff's vested property rights.

70.     Plaintiff had accrued 15.5 days of leave during his prior mobilization to Italy and
elected to carry that balance forward to his subsequent orders (**Exhibit B**). Had the Navy

properly accounted for this time, Plaintiff could have used terminal leave to bridge the 72-hour gap between his discharge (December 8) and his scheduled surgery (December 11).

71.    Crucially, terminal leave maintains Active Duty status. While post-discharge TAMP provides insurance coverage, it does not preserve the Active Duty status required to access the Military Treatment Facility (MTF) where Plaintiff's surgery was scheduled.

72.    By erasing this leave balance and showing "zero days" available, the Navy not only deprived Plaintiff of vested pay but actively stripped him of the specific legal status required to walk into the operating room.

**H. The Navy Released Plaintiff Three Days Before Scheduled Surgery**

73.    Plaintiff was released from active duty on December 8, 2024, three days before his scheduled ACL reconstruction on December 11, 2024.

74.    Under Tricare regulations, termination of active-duty status immediately eliminated Plaintiff's eligibility for the scheduled surgery and all related medical care.

75.    No alternative treatment plan was provided. No referral was issued. No LOD determination existed to preserve eligibility for later benefits.

76.    The Navy's release directly violated DoDI 1241.01's requirement to maintain active-duty status until LOD causation is determined.

**I. Post-Release PERS-95 Actions and Attempts to Provide Relief**

77.    On December 13, 2024, CDR Jared Henderson, Division Director of PERS-95, sent an email to Plaintiff's chain of command acknowledging: (a) Plaintiff's injuries fit the parameters for "LOD-HC" (Line of Duty Benefits for Health Care), a statutory benefit for service-connected injuries; (b) Plaintiff's surgery was medically necessary; (c) the denial of

MEDHOLD prevented the surgery; and (d) issuing an LOD-HC could belatedly give him a path to surgery. (A true and correct copy of this email is attached hereto as **Exhibit D**)

78.      This admission confirms: the injury was duty-related or potentially duty-related; Plaintiff required surgery; the Navy's denial of § 12301(h) created the unlawful gap in care; and the Navy failed to follow mandatory procedures.

79.      PERS-95's attempt to offer LOD-HC after the fact did not undo the harm of the cancelled surgery or the loss of status.

**J. Subsequent Communications With Navy Regarding Interim LOD Inquiry**

80.      Subsequent to his release, in January 2025, and while attempting to cure the administrative error, Plaintiff submitted a Special Request to his local Navy Reserve Center (NRC) to request the mandatory Interim LOD inquiry required by JAGMAN § 0224 (See Special Request Chit, **Exhibit J**).

81.      On July 9, 2025, acting as the designated representative for another sailor, Plaintiff contacted REDCOM Great Lakes to request an interim LOD inquiry. In response, the Staff Judge Advocate, Captain Pennix, engaged in affirmative misconduct by feigning ignorance of that sailor's status to avoid processing the claim. Despite having access to personnel records, Captain Pennix demanded proof of enlistment and incapacitation, and explicitly stated, "I have NOT initiated an LOD inquiry" (See Email from Captain Pennix, attached hereto as **Exhibit H**).

82.      This refusal constituted an "active blockade" of the Plaintiffs' attempt to access the administrative remedies provided by law, concealing the cause of action and preventing the exhaustion of administrative remedies.

83.      On or about May 2025, the Navy removed SECNAVINST 1770.5 (See **Exhibit T**, SECNAVINST 1770.5) from public access, and, when Plaintiff sought clarification, Navy

officials—including OJAG Code 13 and REDCOM staff—affirmatively declined to clarify the status or applicability of required regulations, thereby preventing Plaintiff and the putative class from discovering and asserting their rights under JAGMAN § 0224 and related provisions. (See OJAG Code 13 Correspondence, **Exhibit X**)

84.    This strategy of concealment was enforced by the Office of the Judge Advocate General (OJAG). On November 13, 2025 Plaintiff contacted OJAG Code 13 (Administrative Law) to seek clarification regarding the removal of SECNAVINST 1770.5 and the impact on his clients' rights. Despite the JAG's duty to provide legal clarity on Navy regulations, the Code 13 representative explicitly refused to address the inquiry, stating: **"...[O]ur office is not in a position to answer that question."** This refusal to clarify the status of the missing regulation affirmatively prevented Plaintiff from verifying the legal basis of his claim, triggering the equitable tolling of the statute of limitations (**Exhibit X**).

## K. Access to Veteran Service Organizations During Demobilization

85.    Congress enacted 38 U.S.C. § 5701 to provide confidentiality for communications between claimants and their accredited representatives. This "safe harbor" is essential for due process, as it allows servicemembers to disclose sensitive medical history (such as self-medication or trauma) without fear of punitive action by the Chain of Command.

86.    By barring VSO access at MDSC and forcing Plaintiff and Class Members to rely solely on military command channels or "script-only" contractors, the Navy deprived them of this statutory protection. This deprivation chilled the reporting of the very conditions required for accurate adjudication, creating an unacceptable risk of erroneous deprivation of benefits.

## VI. HARM TO PLAINTIFF

13

**A. The Navy's Failures Caused the Cancellation of Plaintiff's Scheduled ACL**

**Reconstruction**

87.     Because Plaintiff was released from active duty on December 8, 2024—three days before his scheduled ACL reconstruction—his surgery was cancelled.

88.     Tricare eligibility for active-duty care terminated immediately upon release, foreclosing the procedure Army surgeons had deemed medically necessary.

89.     The cancellation of the surgery is a direct and foreseeable consequence of the Navy's failure to issue an interim or formal LOD and its unlawful denial of § 12301(h) retention.

90.     Had the Navy complied with its regulatory obligations, Plaintiff would have remained on active duty through surgery and postoperative care, as required by statute.

**B. Plaintiff Suffered Loss of Access to Military Medical Care and Continuity of Treatment**

91.     The loss of active-duty status deprived Plaintiff of: (a) access to military treatment facilities; (b) Tricare Prime Active Duty coverage; (c) scheduled surgery; (d) follow-up orthopedic care; and (e) continuity of care necessary to stabilize his injury. These irreparable harms are ongoing.

**C. The Navy's Failure to Issue an LOD Created an Evidentiary Gap With Consequences**

**Across Multiple Systems**

92.     Because the Navy never issued the mandatory interim LOD, and because no formal LOD was initiated, Plaintiff lacks the contemporaneous documentation required for: (a) Disability Evaluation System (DES) referral; (b) Department of Veterans Affairs (VA) service-connection adjudication; (c) Military medical benefits; and (d) Long-term readiness classification and records accuracy.

14

93.    VA adjudicators and Navy disability evaluators require LOD documentation as a threshold element for determining line-of-duty causation. Plaintiff is now prejudiced because the Navy failed to generate the documentation that federal law required the Navy—not the member—to produce.

**D. Plaintiff's Duty Status Was Erroneously Recorded, Resulting in Long-Term Administrative Harm**

94.    Plaintiff's duty status was coded as if no duty-related injury existed, despite extensive medical documentation to the contrary.

95.    These inaccurate records now impair Plaintiff's ability to access the Medical Evaluation Board (MEB) process without incurring significant personal cost, travel burdens, and lost wages—burdens that would have been borne by the government had the proper retention orders been issued.

96.    These administrative harms are concrete and ongoing, and they stem directly from the Navy's refusal to initiate the required LOD process.

**E. The Navy's Systemic Failures Caused Harm That Cannot Be Corrected by Individual Remedies**

97.    The cancellation of surgery, loss of care, evidentiary gaps, and erroneous duty-status coding cannot be remedied through internal Navy processes.

98.    Indeed, the refusal to retain the Plaintiff on active duty does not stem from administrative ambivalence, it is codified in PERS-95's internal procedures. **PERS-95 SOP 6000 (Aug. 2022)** explicitly instructs commanders: 'IF SAILOR IS NOT ALREADY IN THE MRR PROCESS, DO NOT SUBMIT A MRR PACKAGE FOR LOD-B'.

15

99.    Navy LOD appeals do not stay releases from active duty, do not restore care lost due to improper separation, and do not allow reconstruction of contemporaneous medical documentation.

100.    Henderson's December 13 email demonstrates the Navy's own view that Plaintiff's case required ad hoc repair mechanisms because mandatory procedures were never followed.

101.    These harms are redressable only through declaratory and injunctive relief compelling the Navy to comply with its statutory and regulatory obligations.

**F. Plaintiff's Injuries Are Typical of Class Members and Demonstrate the Systemic Nature of the Violations**

102.    Plaintiff's harms mirror those experienced by other Navy Reservists who present with potentially unfitting medical conditions: no interim LOD issued; no formal LOD initiated; improper denial of § 12301(h) retention; premature release despite ongoing evaluation; cancellation or loss of access to treatment; and long-term prejudice in VA, DES, and Navy personnel systems.

103.    The identical pattern of injury affecting other reservists confirms that Plaintiff's harms are not isolated or discretionary but arise from systemic Navy practices.

## VII. CAUSES OF ACTION

## COUNT I AGENCY ACTION UNLAWFULLY WITHHELD (Violation of 5 U.S.C. § 706(1))

104.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs.

16

105.   Under the Administrative Procedure Act, 5 U.S.C. § 706(1), a court shall "compel agency action unlawfully withheld or unreasonably delayed."

106.   JAGMAN § 0224 imposes a nondiscretionary, mandatory duty on the Navy to issue an interim LOD determination "within seven days" of a reservist presenting with a potentially unfitting condition. The Navy failed to perform this discrete, mandatory act for Plaintiff and the Class.

107.   10 U.S.C. § 12301(h) imposes a nondiscretionary, mandatory duty to "order to or retain on" active duty any reservist requiring medical evaluation or treatment for a service-connected condition. The Navy failed to perform this duty, releasing Plaintiff three days prior to his medically necessary surgery.

## COUNT II AGENCY ACTION ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW (Violation of 5 U.S.C. § 706(2)(A))

108.   Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs.

109.   Under 5 U.S.C. § 706(2)(A), a court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

110.   The Navy denied § 12301(h) retention based on the requirement that the injury must have occurred on the current set of orders, a condition not found in the statute.

111.   The Navy refused to initiate LOD inquiries for secondary conditions is contrary to 10 U.S.C., DODI 1241.01, and SECNAVINST 1770.5.

112.   The Navy's policy of obstructing accredited VSO representation at demobilization sites—and refusing to recognize valid designated representative forms—is contrary to SECNAV M-1850.1, violates the statutory right to counsel under 38 U.S.C. § 5902,

17

and deprives reservists of the pre-separation counseling protections mandated by 10 U.S.C. § 1142.

113.    By barring VSO access and forcing Plaintiff to rely on non-confidential command channels or "script-only" contractors, the Navy acted contrary to law by depriving Plaintiff of the statutory "safe harbor" of confidentiality guaranteed by 38 U.S.C. § 5701. This deprivation significantly increased the risk of erroneous adjudication by chilling the disclosure of sensitive medical history.

## VIII. CLASS ACTION ALLEGATIONS

114.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

115.    **Equitable Tolling**: The Class claims are preserved by equitable tolling. The Navy engaged in affirmative misconduct by: (1) systematically concealing the existence of SECNAVINST 1770.5 (the regulation mandating retention and benefits) by removing it from public directives; and (2) employing an "active blockade" strategy regarding JAGMAN § 0224. Specifically, the Navy utilized mandatory "script-only" briefings at demobilization centers to affirmatively misrepresent eligibility criteria—omitting references to the JAGMAN's 7-day mandate and asserting extra-statutory "temporal locality" rules. This systemic disinformation prevented Class Members from exercising due diligence or discovering that the Agency's denial was a violation of law rather than a valid exercise of discretion.

## IX. PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

1.    Certify the Interim LOD and 12301(h) Retention Classes;

2.    Appoint Class Counsel under Rule 23(g);

3.        Declare that the Navy's "temporal locality" rule is contrary to 10 U.S.C. § 12301(h);

4.        Declare that the Navy's failure to issue Interim LODs violates JAGMAN § 0224;

5.        Issue a permanent injunction requiring timely Interim LOD determinations and compliance with DoDI 1241.01's retention mandate;

6.        Issue a permanent injunction prohibiting the Defendant from obstructing access to accredited Veterans Service Organizations (VSOs) during demobilization and requiring the recognition of valid VA Form 21-22 and DD Form 2870 filings;

7.        Order the Navy to recall Plaintiff to active duty under 10 U.S.C. § 12301(h) or 12322 until he is found fit or processed through the Disability Evaluation System;

8.        Order the Defendant to correct Plaintiff's naval records, including DD-214s and leave balances, to reflect continuous active-duty status for the duration of his required medical evaluation and treatment;

9.        Award Plaintiff's appointed class counsel reasonable attorney's fees and costs under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412;

10.       Grant any other relief the Court deems just.

DATED: January 16, 2026                 Respectfully submitted,

Nathan P. Doherty pro se
YN1(SS), USNR
VSO, American Legion, VA Accr. No. 53401
95 Franklin St., Room 800, Buffalo, NY 14202
Phone/Fax: (716) 858-8721/(716) 858-6191
Nathan.Doherty@erie.gov